You're next from the parties in Long v. Parry. Good morning, Your Honors. Max Falkenflik, Falkenflik & McGarrity, LLP, representing the appellant, Dr. Raymond Long. I think you need to move the microphone more, thank you. Thank you. This is an appeal from summary judgment for the defendant's attorneys, who I'll refer to collectively as Parry, a case where legal malpractice caused their client to accept a settlement that was inadequate. Now on the motion below, Parry did not deny his malpractice, did not deny that that caused Dr. Long to accept the settlement. Instead, they just claimed that Dr. Long could not prove, as a matter of law, that he could have received a higher settlement or a higher result at trial than the $4 million he received. Now the problem with that argument It's an element of malpractice, so it's effectively saying that you're not able to prove an element of it, right? Well, not able to prove the damage element, that's correct. The injury element. The injury. Yes. But in this particular case, because of the wrongdoer rule in Story Parchment and its progeny including this court's decision in Boyce v. Soundview, the parties agree on this appeal that the only element to prove is whether there was any damage at all from the malpractice, not how much. The speculativeness or the difficulty of proof There would have to be damage in a recovery in an amount more than the $4 million that was the settlement, right? That's correct. It would have to prove that there was an amount greater than $4 million might have been obtained, the jury might be able to find, the reasonable jury could find, that the settlement might have been higher or the result of trial might have been higher. When you say might have been obtained Yes. There's some space between speculative might have and real might have. There is, and the Boyce v. Soundview makes it absolutely clear that that issue of speculativeness, once there is an understanding that any amount of damage could have been obtained, the burden of speculation falls on the shoulders of the wrongdoer. So it is not Dr. Long's requirement to prove how much he would have obtained, just that they might have offered more. Now on this motion for How likely was it they would have offered more when the antitrust lawyer says, you don't have much of a case here, and Dr. Jarvis didn't even provide his report before the $4 million? Wasn't that all? The fact that Dr. Jarvis didn't provide his report is the malpractice itself, Your Honor. The fact that You didn't make Jarvis give the report earlier? That Jarvis wasn't retained and produced a report earlier, that Parry lied, according to the evidence before the court, to his client about the availability of Dr. Nichols, whose report presumably would have reached much the same result, that Parry lied to Dr. Long about his ability to obtain a report from Dr. Jarvis, that Parry committed malpractice by not seeking that report and getting that report earlier. Now, Dr. Jarvis's report is an extraordinary, game-changing event. It proves, if the jury were to accept it, and on this motion for summary judgment, the court must accept it as true, Dr. Jarvis is one of the most renowned infectious disease and epidemiologic experts in the world. You paid Jarvis $5,000 before the settlement, right? Actually he had not paid Dr. Jarvis anything before the settlement. In the record, it is a little unclear, Dr. Long did not pay Dr. Jarvis, but he expected to receive a bill from him for a conversation they had before the settlement occurred. He did not review the files, he was not given the documents, that's part of the malpractice, he did not render an opinion, and his opinion shows that for the antimicrobial sensitivity analysis You say he didn't render an opinion, and you say his opinion shows He rendered an opinion later. Subsequently, Dr. Long had additional ongoing proceedings, sought from Dr. Jarvis an opinion, and was surprised to find that Dr. Jarvis was able to trace the infectious bacteria to the specific bacteria the hospital had acquired itself, supposedly for quality control purposes. And Dr. Jarvis' report makes absolutely clear, you can read it in the record, pages 331-348, that Dr. Jarvis' report makes absolutely clear that it was intentional infection Dr. Jarvis' report was October 19th, 2015. Yes. When was the $4 million settlement? The $4 million settlement was in 2008, January 2008. It was seven years later. That's correct. After the malpractice action had been filed. That's correct. The Jarvis report was finalized, right? That's correct. It was after the The seven year period is of no moment, then. In 2012, the malpractice action was commenced when Dr. Long began to find that there was evidence that he had been lied to by his attorneys, and that his attorneys had failed to develop important evidence. Dr. Jarvis' formal report was obtained in 2000, much later, but Dr. Jarvis' formal report was obtained in connection with other proceedings that Dr. Long was engaged in, in an attempt to clear his Malpractice lawsuits that were in front of us, right? Pardon me? Malpractice lawsuits. No, it was not in connection with that. It was, well, it was later, during the course of the malpractice lawsuit, but it was not the triggering event of the malpractice lawsuit, the receipt of that report. The problem, Your Honor, the problem with the decision below is that under Rule 56, and longstanding authority by this Court, it's absolutely clear that the move-in must prove that there is no dispute, material disputed issue of fact, and the move-in must prove he's entitled to judgment as a matter of law. Now, there is no evidence in the dispute that, well, I guess there's a potential dispute, you'll say, but was there a genuine dispute that the resignation of Dr. Long was a voluntary resignation? Absolutely, Your Honor. In fact, in fact, in the opinion below, Judge Sessions claimed, found that it was not voluntary, that Dr. Long didn't really have a choice. He was offered a choice of immediate suspension. It was clear that he was going to be reported to the National Practitioner Data Bank one way or another. That it was clear that the investigation by the Medical Executive Committee was, to him, was a sham proceeding. And worst of all, they were insisting that if he stayed at the hospital even for a matter of days, he had to cease protecting his patients. Where do you see that the district court, Judge Sessions, determined that the resignation was under duress? Well, he determined in, I cited in my reply brief, Your Honor, but the, let me just- You just said Judge Sessions found, so we want to see where he made the finding. Yes, if you give me one minute, I will give you- Give us the site. The discussion of that starts at page 25, where the- Page 25 of my reply brief. And the court found that Judge, Dr. Long had been subject to immediate and voluntary suspension. That's at SPA 42. So what happened is that- SPA 42, is that Judge Sessions- That's Judge Sessions' opinion, that's in the special appendix. Can we just find it for a second? Surely. It's a special- Lengthy opinion. It is a very lengthy. It's attached to your brief, right? It is. Where on that page does it say that? Initially, the court agrees with Dr. Long that threatening him with the summary suspension if he refused to amounted to an immediate suspension. I'm looking at a copy of Judge Sessions' opinion. You're saying it's attached to your brief? Yes, the special appendix in accordance with the court's- No, I have the actual opinion. What's the- It's the same page, 42. I have the opinion, not as published in your brief as from Westlaw. Do you know where in the opinion it is? On Westlaw, I do not have this- The title heading of the section it's in is Three Small Lies, Adequate Notice, and Hearing Procedures. Thank you. It says immediate suspension. Yes. Would you- Yes, well, Your Honor, and the reality here is- Does that mean he resigned under- He resigned because he felt he had no choice. The evidence- Would you please find me another point where the district court determines that it was an involuntary resignation? He didn't say the words involuntary. He said that he was faced with, he didn't have a choice. It was effectively, he was suspended by the MEC immediately. And then he resigns. Now, if I may deal with the- Words matter. So that's a very different thing from a determination that it was an involuntary resignation. It is somewhat different, Your Honor. But what I do intend to impress on the court is that there is substantial evidence that Dr. Long, under Vermont law, was faced with no choice other than resign. And voluntary resignation doesn't change very much in this case. We have tortious interference claims, which can be a result of the wrongful acts that were committed by the defendants. Under Vermont law, I- How do you find an injury flowing from a voluntary resignation? Doesn't that cut off the injury, at least as it relates to the hospital center? No, Your Honor, I do not believe it does, respectfully. I believe that the injury is the result of the injury to Dr. Long's reputation from the fact that his patients were poisoned by the hospital. Now, I think what I'm afraid, I'm not making clear- Maybe you have the remaining claims, I take it you're saying, of defamation. Well, and tortious interference as well. Tortious interference as well. Well, tortious interference. Yes. If you commit a wrongful, under Vermont law, if there is a wrongful or criminal act, and that act interferes with the prospective advantage of the doctor with his future patients. And getting a reputation for having patients be infected with bacteria during operations is that kind of act. If you commit that act, you're entitled to sue for damages resulting from that. And we think the damages did result from that. Even if the damages resulting from that flow out of a voluntary resignation, where you just say, you know what, I stop. I'm out of the business of practicing medicine. No, he was not out of the business of practicing medicine. He was out of the business of practicing medicine at Northwestern Medical Center only. That's all he resigned from at that time. Northwestern Medical Center, a place where his patients were intentionally poisoned. But what I'm afraid I'm not making clear, Your Honor, is that the burden on this motion was for the defendants to prove the absence of any evidence from which a jury could conclude that, let's just take voluntary resignation. That Dr. Long was faced with a choice and didn't have a choice and was compelled to resign by the wrongful acts of the hospital. That a jury could conclude that they didn't provide evidence that there was no chance of getting a higher settlement or verdict. If- We understand your argument and you're well past your time. You want to reserve time for rebuttals. Yes, please. We'll hear from your adversary and then let you rebut. Good morning, and may it please the court. Justin Barnard of Dinsey Napa McAndrew for the Appalese. This appeal arises from litigation that's now stretched well over a decade across three separate federal court cases, all concerning in one manner or another Dr. Long's departure from Northwestern Medical Center. As such, there is a fairly involved factual record. But for purposes of this appeal, the critical facts are really relatively few, and they're these. In the spring of 2004, Dr. Long was going around claiming that he was the victim of a conspiracy intended to force him from the practice of medicine at Northwestern Medical Center by those at his hospital. And it was being carried out by intentionally infecting his patients, inducing dangerous bacterial infections in the hospital's patients for the purposes of ruining his career. That's a remarkable accusation. He did not have any evidence, and still does not, that any particular people at the hospital were responsible. He jumped to the conclusion that this was a conspiracy to target him. And the hospital took a very reasonable step in response. It convened an ad hoc committee to look at these allegations, to interview staff who worked with him, to look at his history with the hospital. That ad hoc committee made recommendations to the medical executive committee at the hospital, which then proposed a very modest corrective action. They said, we will bring in outside experts to look at these infections in Dr. Long's patients. And we'll ask Dr. Long to voluntarily abstain from conducting any further surgeries, undergo a psychiatric evaluation, and if he refuses, his privileges will be suspended, not terminated, just suspended until the hospital can figure out what's going on. Instead of, Dr. Long had two options at that point. He could have complied. He could have said, I won't conduct any further surgeries. I will undergo a psychiatric evaluation. He could have asked for a fair hearing, and that was offered to him. In the letter communicating the hospital's decision to him, he was offered the chance for a fair hearing. He did neither of those two things. Instead, he resigned in a fit of pique, and that process and his resignation are effectively dispositive in this case, because they would have been dispositive of his chief claims below. So, your adversary says that they're not really dispositive of a tortious interference claim, and presumably also the defamation claims. Well, Your Honor, I agree that they would not necessarily have been dispositive of the defamation claim. The tortious interference claim was based on the claim that he- This is under Vermont law. This is under Vermont law, you're correct. An area of real expertise. But I think here, Your Honor, I think the important thing is that what he was claiming, the damage he was claiming for that tortious interference was the loss of his earning capacity, the loss of the chance to continue to practice, because he'd been forced from practice by the hospital's acts. The fact that he made a choice to resign when the only thing pending was a very preliminary action against him, cuts off that theory of harm. He could not show, on a tortious interference claim, on other claims, that his predicament was caused by the hospital. It was a self-inflicted wound. I think his argument, because we are obliged to view the facts in the light most favorable to him, is that he resigned and had a cloud on him. Certainly, his former hospital was not about to say anything positive about him. And that that impeded his ability to practice medicine thereafter. So why don't you tell me why that claim, if successful, could not be worth more than $4 million? Well, Your Honor, I think- Because we have to assume that there's something here, and you paid $4 million, right, to settle this dispute. So what does the jury get to do, if this case were to go forward, retry the whole saga you've just talked about and decide whether he was damaged more than $4 million? Yes, Your Honor, although- Although we have to consider the circumstances, not as you've put them, but in the light most favorable to the doctor. And then we have to decide whether a jury could think that this injury to his reputation, this interference with his contract rights, such as they are, or tortious interference, could have resulted in an award of more than $4 million. I agree, Your Honor, except that these claims, I think, are barred as a matter of law, because no reasonable jury could have found that his resignation was anything but voluntary. Judge Sessions thoroughly analyzed this issue in his opinion, and I think reached the correct result. Just based upon undisputed facts, Dr. Long had options at the time he resigned from New York- We questioned counsel on whether Judge Sessions made any finding in that respect, which we expressed some doubt, the panel expressed some doubts about. But don't you have to show us that no jury could have found that the resignation was effectively compelled? Well, yes, Your Honor, on that aspect of our defense. And I think that no reasonable jury could find it, given that the analysis applied under Vermont law and the law that's been applied by other circuit courts is based upon a number of factors that evaluate voluntariness. The chief of which is whether there were reasonable alternatives. That's something that judges can and do decide on summary judgment. Here, Judge Sessions looked at the options available to Dr. Long, which are undisputed. He says, well, I couldn't have gone back to practice because I was concerned about my patients. There were these infections that had yet to be resolved. Well, that's exactly why the medical executive committee asked him to stop conducting surgeries and recommended that outside experts be brought in, so there was no real concern that, at least imminently, that his patients were at risk. Is there any evidence that he could not practice medicine outside of Vermont? No, Your Honor. I don't think that there is any evidence in the record that he could not. His claim has been that this was a black mark on his record, the resignation, and particularly the adverse action report. Maybe on the claim, there was no evidence, yeah. There's no evidence, Your Honor. That is correct. Speaking regular tort terms, no evidence of an attempt to mitigate the damages that he's claiming he's got, right? That is correct, and just to be clear, there's no evidence in the record. It may be that he has attempted to mitigate. Can I ask you what you make of the Jarvis report? I mean, his claim was that people in the hospital were intentionally infecting irrigation solutions of his patients, causing them to be sick. That was his principal claim many years ago. And now we have this Jarvis report which says, yeah, I think it happened. What did the hospital do about that? Did they say, really? We have people working in our hospital who were, because they hated this doctor so much, were putting bacteria in innocent people's solutions, irrigation solutions? Well, Your Honor, I'm not sure that the hospital ever saw the Jarvis report, so I can't speak to how the hospital reacted. What about at the time? You must have investigated this when the doctor raised it, when the plaintiff raised it. They did indeed investigate it. They called in two outside experts. The results of those reviews, they were disclosed in the underlying case under the protective order. So I don't have access to them. We have destroyed all those documents. But I think, just to get back to the Jarvis report- Is there any reason to believe that they ever found that there was any substance to this claim? Not to my knowledge. And I should be clear, the Vermont Attorney General's Office investigated this, the Vermont Medical Board, the Joint Committee on Accreditation. And there is no indication that any of them found any basis to believe that there was improper criminal behavior. The Vermont Attorney General's Office issued a statement to the press at some point after, several years after the events that gave rise to this lawsuit, and said that there was no indication of any wrongdoing or criminal behavior. But I think it's important to understand that the Jarvis report does say that the most likely cause of these infections in Dr. Long's patients was intentional contamination. It doesn't say who contaminated the surgeries. The report was in 2015, and when were these surgeries performed? They were performed in November and December of 2003. And I think that is a critical point, because under the HCQIA, which provides immunity and is one of our defenses here, would have been one of the hospitals. That sort of post-hoc expert analysis is irrelevant to the question of immunity, because the HCQIA requires that you look at what was before the hospital at the time. And the steps that it took in determining whether they're reasonable. They don't have to have been right. Courts have said that a hospital can get the facts wrong and still be entitled to protection because if you allowed physicians to get expert reports after the fact to defeat HCQIA immunity, essentially it would be a hollow shield. The Fifth Circuit in Texas, in Polliner v. Texas Health System said, in response to an expert opinion that was offered to defeat HCQIA immunity, that it was improper to take that into account in assessing whether the hospital was entitled to immunity. I see that I'm- Would you briefly address the defamation, the remaining defamation claim? Sure, your honor. I would say two things about the remaining claims that would not be defeated. It's a false lead in defamation. And number one, they have not claimed malpractice in connection with those claims. They have not claimed that my client erred in his preparation of the evidence regarding those claims. Those claims were based on three specific sets of allegations. One was a letter submitted by a doctor at the hospital, the credentialing committee. Another was a sign that was posted in the hospital's diagnostic imaging library that said Dr. Long could no longer take out images. And the third were a couple of statements that reached, I think, two patients by one of the doctors at NMC that questioned his professional competence. So, our first argument on the defamation and false lead claims is simply that there's no malpractice claim. There's no damage as a result of the claim of malpractice. The second is that no reasonable jury could possibly find that given the very limited nature of those claims that a $4 million settlement was less than what Dr. Long could have expected. Thank you, and in closing, I'd ask the court to affirm the district court opinion in its entirety. Your Honor, let me start with the correct answer, with all respect to my colleague, to the question of what did the hospital do with the infections. There were five infections that occurred within a one month period of the patients of only one doctor. At the time, he sent out some of the fluid he was using in the surgeries to be analyzed by Fletcher Allen Healthcare. And it was found to be massively infected. What did the hospital do? Absolutely nothing. It didn't do anything in January, it didn't do anything in February, it didn't do anything in March. In April, it rendered an opinion basically saying that he had to be psychiatrically examined because he was paranoid, but they never investigated whether his concerns, that his patients were being targeted, was correct or false. They never investigated at all. The outside investigations that counsel points to aren't in the record, but I will tell you this much about them. None of them occurred before the board acted, before the board immediately suspended Dr. Long. And yes, Judge Loya, he resigned in connection- Fletcher, though, said that they were unable to reproduce the results. And they didn't investigate, I don't know what that means, Your Honor. It could mean that instead of 800 units of staff infection, they only produced seven. It could mean that they were unable to reproduce those results because they contaminated the sample. It could mean millions of things, but that wasn't investigated either. Long was told over the phone by a technician of Fletcher Allen that there were problems with the samples? Not just problems, massive, massive- Is there a document that says that? I don't believe there's a, there are documents in the record that reflect that Dr. Fletcher Allen reported- You know what I'm asking about? Was he just told over the phone, yeah, there's something wrong with these- No, no, he was not just told. He was given specific results that he reported to the- Right. I don't see in the record a written report from Fletcher Allen's healthcare, but it was confirmed that the initial results were, as Dr. Long reported them, massive infections. I'm asking you. Pardon me? You know what I'm asking you. I do. Let me ask you again then. Did he ever get a written report from Fletcher saying there was contamination? I don't believe there is a written report from Fletcher saying there is contamination. I don't believe that there was ever any doubt that that report was received. And there was never any investigation of that report. I mean, let's- My concern is this. Pardon me? My concern is this. The question is not whether there were issues about the dispute between the parties and that those disputes were, you know, of- that people could be of two minds. That's why there are settlements. The question is whether the failure to obtain this antitrust expert and infectious disease expert report before making- before reaching a settlement was malpractice. So instead of, you know, trying to litigate the underlying dispute, would you just take one moment and tell us what fact was ascertained as a result of the antitrust and infectious disease specialist that would have altered the view of all of this? Well, there are two things about that, Your Honor. First of all- Very quickly, because your time is up. Very, very quickly. Just explain to us exactly what you want us to look at. Just quickly, Your Honor. First of all, they do not deny, for the purpose of this motion for summary judgment, they do not deny that it was malpractice and that it was malpractice. You're not listening to the question. Well, let me- What is it in the reports ascertained after the fact that you're saying show that the failure to ask- to get those reports beforehand would have resulted in a larger settlement? Yes, Your Honor. There are two things. First of all, the antitrust expert, Dr. Long, was told could not support his case. The antitrust expert- I'm sorry. Antitrust expert said- Could not. Dr. Long was told falsely that the antitrust expert could not support his case. The antitrust expert said he could. That it was- And where in the record do you want us to look for that particularly? It was in- I don't have the paragraph in Dr. Long's- It's Dr. Zaner, right? Pardon me? Attorney Zaner? No, no, no. It was Attorney Frey. But Karen- It was Frey. Karen Zaner was an antitrust attorney. Clifford Frey was an antitrust expert. And it was Clifford Frey. It was Dr. Long stated, not denied on this record, not denied by the defendants, that- and in the record there is a email from- I'm looking at this because your client can't testify to what Clifford Frey said. So where is- Oh, right. We have- Where is it in the record that Clifford Frey- Your Honor, I'll supply you with the page number. But Clifford Frey wrote an email, it's in the record, that says that he could support $6 million of lost earnings, which in an antitrust case translates to $18 million- So what Mr. Frey actually said was that the case was iffy and the antitrust claims would be tough to prove. Is that correct? No, what he said was the antitrust case might be- The word's iffy? He used the word iffy and said it might be difficult to hold on appeal. Right. But that he could prove- that he could get through a trial. Well, if he were to succeed, he could do $6 million- he could justify $6 million, not the $44 million you were asking for. So, you know, this is party settled. They weren't prepared to pay that just on an iffy claim reaching $6 million. Okay, what's the infectious disease statement? Well, the infectious disease is a much stronger piece and that's conclusive or unchallenged at this point and very strong proof- Don't argue around it. Point me to where in the record- The Jarvis report. Was the new fact ascertained? Right. The Jarvis report at page number 338. The date of that report? Excuse me, 345, that's the 2015 report that Your Honor referred to. And the question here is whether when the jury looks at a report by a respected expert or- Tell me what the statement is in here that you want to- The statement is that there are two. At 345, that the infections referred to, the three to four SSIs, that's strategic site infections, occurred and patients were intentionally infected through intrinsically and intentionally contaminated irrigation fluid or other surgical materials provided by NMC, that's the hospital personnel, and used by Dr. Long. And then the additional information that appears in this- You're looking at the very last paragraph of his letter. That's correct. A much more likely explanation. Yes, that's correct. Let me ask you this. A district court seeing that opinion, even by someone with credentials like this, would want to know what objective methodology Dr. Jarvis used to reach a conclusion such as that. I mean, it looks to me like he eliminated other possibilities. But what is the objective criteria for reaching this conclusion? As an expert, he might only have been able to testify to what he excluded, not to offer an opinion such as this. Well, he did offer an opinion. He provided in his- I'm just saying what is admissible under Daubert. Under Daubert, his opinion was, and it hasn't yet been challenged. And on this issue is, can the district court find the facts against- Can a fact finder do it? And the question's going to be whether it's going to be admissible that he offers an opinion that it's not A, it's not B, it's not C. So the likely explanation is D. Based on what? Okay, Your Honor. Based on two different- He's basically saying that the action was criminal? Yes, yes. What's his expertise in that? His expertise is that he was the chief infectious disease investigator for the Centers for Disease Control for nearly two decades. He was in charge of their outbreak investigations. Right, that gives him no expertise in people's criminal malicious motives. That's not what we're talking about in his report. What we're talking about is- I think I have my answer. If I can say to the methodology, Your Honor. Go ahead. The methodology was two. Number one, he explored in great detail the statistical likelihood that any other, that these things could have happened through any other cause. And he found that to be statistically extraordinarily unlikely. Number two, there were two, I said. The second thing, with Your Honor's permission, is that he looked at what is the fingerprints of the bacteria. That's the antimicrobial sensitivity of these bacteria. And showed that only the bacteria which the hospital had purchased would fit that fingerprint. So, he looked at that evidence. And here, on this record, we're to determine whether these defendants have proven that they're entitled to judgment as a matter of law. As Your Honor pointed out, there may be disputes. All right, we're going to take the case under advisement.